UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DORALEH CONTAINER TERMINAL SA,<br><br>Petitioner,<br><br>v.<br><br>REPUBLIC OF DJIBOUTI,<br><br>Respondent. | Misc. Action No. 23-83 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION AND ORDER**

Respondent Republic of Djibouti ("Djibouti") seeks to quash subpoenas served by petitioner Doraleh Container Terminal SA ("DCT") on ten non-party banks in connection with DCT's post-judgment discovery efforts in *Doraleh Container Terminal SA v. Republic of Djibouti*, No. 20-cv-2571 (D.D.C.). *See* Resp.'s Mot. Quash, ECF No. 1; Resp.'s Mem. Supp. Mot. Quash ("Resp.'s Mem."), ECF No. 3. DCT opposes the motion to quash and cross-moves for its attorneys' fees and costs incurred defending against Djibouti's motion. *See* Pet.'s Opp'n Resp.'s Mot. Quash & Mem. Supp. Cross-Mot. Sanctions ("Pet.'s Mem."), ECF No. 16; Pet.'s Cross-Mot. Sanctions, ECF No. 17. For the reasons below, both motions are denied.

**I.    BACKGROUND**

The factual and procedural history of the underlying dispute are detailed in this Court's prior opinions. *See Doraleh Container Terminal SA v. Republic of Djibouti* (*Doraleh I*), No. 20-cv-2571 (TFH), 2023 WL 2016934, at *1–3 (D.D.C. Feb. 15, 2023) (confirming arbitration awards to DCT); Mem. Op. & Order (*Doraleh II*), No. 20-cv-2571 (BAH), ECF No. 57 (Apr. 24, 2023) (denying Djibouti's motion to stay execution of judgment without requiring posting of supersedeas bond). As relevant here, on February 17, 2023, judgment was entered in favor of

DCT, confirming two foreign arbitration awards issued in 2019 by the London Court of International Arbitration against Djibouti, totaling approximately $541 million. *See Doraleh I*, 2023 WL 2016934, at *1; *Doraleh II* at 1, No. 20-cv-2571, ECF No. 57. On February 24, 2023, Djibouti appealed that ruling to the D.C. Circuit, where the appeal remains pending. *See* Notice of Appeal to D.C. Cir. Ct., No. 20-cv-2571, ECF No. 48.

Meanwhile, Djibouti moved to stay execution of the judgment and post-judgment discovery without requiring the posting of a supersedeas bond. *See* Resp.'s Mot. Stay, No. 20-cv-2571, ECF No. 50. This motion was denied since "Djibouti has not demonstrated that [DCT's] interest in ultimate recovery would be adequately protected absent a bond, and thus is not entitled to an exception from the usual requirement that a supersedeas bond be posted to secure a stay." *Doraleh II* at 2, No. 20-cv-2571, ECF No. 57. At the same time, "Djibouti remains free to secure a stay in this matter by posting a bond, pursuant to Federal Rule of Civil Procedure 62(b)." *Id.* at 6.

Since then, Djibouti has not sought to secure a stay of execution of the judgment or post-judgment discovery, and DCT has thus proceeded with its post-judgment discovery efforts. As part of these efforts, DCT served subpoenas on ten non-party banks, seeking SWIFT messages received or transmitted through the banks' portals or stored in the banks' databases that reflect transactions of at least $25,000 USD, between July 1, 2012, and the date of the search, and that contain in its "message field" any keyword on a list attached by DCT to the subpoenas. *See, e.g.*, Barclays Bank Subpoena at 9–24, Exhibit A-1 of Decl. of Matthew M. Madden Supp. Resp.'s Mot. Quash, ECF No. 4-1.[1] The list of keywords—338 different people or entities that are

---

[1] The parties disagree over whether nine or ten subpoenas have been served, s*ee* Resp.'s Mem. at 1; Pet.'s Mem. at 8, but the subpoenas are the same in all material respects, and thus this dispute is immaterial to the analysis of the parties' pending motions.

allegedly related to Djibouti and its government—spans 15 pages and is broken down into several categories: Chinese Government Organizations (12); Chinese State Owned Companies (22); Companies in the Port/Shipping Sector (15); Djibouti Government Organizations (67); Djibouti Judiciary (18); Djibouti State Owned Companies (58); Private Companies/Individuals Linked to China in Djibouti (5); Private Companies/Individuals Linked to Djibouti President (140); and Others (1). *See id.*; Resp.'s Mem. at 13. The banks have not sought to quash these subpoenas in court and have, in fact, "begun responding" and "cooperat[ing] with DCT to tailor the subpoenas to maximize relevance and minimize burden." Pet.'s Mem. at 22. By contrast, Djibouti seeks to quash the subpoenas. *See* Resp.'s Mem. at 1. DCT, in turn, opposes Djibouti's motion to quash and cross-moves for its attorneys' fees and costs incurred responding to the motion. *See* Pet.'s Mem. at 25.

## II.  DISCUSSION

Although Djibouti has standing to move to quash the subpoenas and its motion is timely, Djibouti fails to persuade that the subpoenas should be quashed. The subpoenas seek SWIFT messages of at least $25,000 USD, during an eleven-year period when the litigation, the arbitration, and the allegations that led to the dispute occurred, and that refer to any of 338 entities or individuals related to Djibouti. The subpoenas are proportional to and in aid of DCT's attempts to enforce a $541 million judgment and are therefore permitted by Federal Rules of Civil Procedure 26 and 69. For these reasons, explained more fully below, Djibouti's motion to quash is denied.

DCT's cross-motion for fees is likewise denied. Federal Rule of Civil Procedure 37(a) does not apply here, where DCT has not moved "for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a). Inherent power sanctions are also inappropriate because DCT

not only has failed to prove, by clear and convincing evidence, that Djibouti's timely motion to quash was filed in bad faith, but also has raised several questionable arguments of its own about the motion's timeliness and Djibouti's standing. These motions are discussed in turn.

### A.      Motion to Quash

DCT raises two threshold objections to Djibouti's motion to quash as to standing and timeliness that are easily dispatched and addressed before proceeding to consider the merits of the motion. *See Bauer v. Marmara*, 774 F.3d 1026, 1031–32 (D.C. Cir. 2014) (explaining that standing is "a threshold jurisdictional requirement," and that a court cannot assume a plaintiff has standing and turn straight to the merits).

#### 1.      Standing

"Ordinarily, a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena." *United States v. Idema*, 118 F. App'x 740, 744 (4th Cir. 2005); *see also Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975) (similar); *Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 785 F. App'x 622, 630 (11th Cir. 2019) (similar); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). Recognizing this principle, DCT nonetheless argues that Djibouti, as only a judgment creditor, does not have "a sufficient privacy or confidentiality interest" to bring this motion because "a judgment creditor's 'general desire to thwart disclosure of information by a non-party is simply not an interest sufficient to create standing.'" Pet.'s Mem. at 12–14 (quoting *Chevron Corp. v. Donzinger*, 325 F. Supp. 3d 371, 387 (S.D.N.Y. 2018)). DCT severely undersells Djibouti's interest in the information sought by the subpoenas. Djibouti clearly has a personal interest in its confidential financial

4

information and that of its government officials, judges, and agencies—information that the subpoenas undoubtedly seek. *See* Resp.'s Opp'n Pet.'s Cross-Mot. Sanctions & Reply Supp. Resp.'s Mot. Quash at 5–6 ("Resp.'s Reply"), ECF No. 19; Resp.'s Mem. at 11. Djibouti has standing to protect this interest by moving to quash. *See Khouj v. Darui*, 248 F.R.D. 729, 732 n.6 (D.D.C. 2008) (recognizing "a legitimate interest in protecting [one's] own private financial information"); *Est. of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009) (concluding that party "claiming a privilege regarding the material sought in the subpoena" had standing to challenge the subpoena served on non-party as overbroad).

### 2. **Timeliness**

Federal Rule of Civil Procedure 45 permits a court to quash a subpoena "[o]n timely motion." Fed. R. Civ. P. 45(d)(3). "Timely" is neither defined in the rule nor discussed in the advisory committee notes, and the D.C. Circuit has yet to offer guidance on the word's meaning in the context of this rule. Courts are split on whether a motion to quash *must* be filed before the time specified in the subpoena for compliance to be "timely." *See U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 278 (D.D.C. 2002) (collecting cases). Nonetheless, a motion to quash filed before the time specified in the subpoena for compliance is generally accepted as timely. *See, e.g.*, *id.*; *Nguyen v. Faunhofer-Gesellschaft Zur Forderung der Angewandten Forschung E.V.*, No. 21-mc-14, 2021 WL 5800741, at *2 (D.D.C. Dec. 7, 2021). Djibouti's motion, which was filed on August 9, 2023, before the subpoenas' return date of August 17, 2023, is thus "timely" under Rule 45(d)(3).

Relying on Rule 45(d)(2), DCT argues that Djibouti's motion is untimely. *See* Pet.'s Mem. at 10–11. By its own terms, Rule 45(d)(2) applies only to "[a] person commanded to produce documents." Fed. R. Civ. P. 45(d)(2). Because the banks—not Djibouti—are the

"person[s] commanded to produce documents," Rule 45(d)(2) is inapplicable to Djibouti's motion.

### 3. Merits

"[L]egal victors may engage in broad post-judgment discovery," *Amduso v. Republic of Sudan*, 288 F. Supp. 3d 90, 94 (D.D.C. 2017), and "[t]he rules governing discovery in post[-]judgment execution proceedings are quite permissive," *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 138 (2014).  Pursuant to Federal Rule of Civil Procedure 69, a judgment creditor may seek discovery "[i]n aid of the judgment or execution" "from any person" as provided by the federal rules and state law.  Fed. R. Civ. P. 69(a)(2); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").  In fact, the Supreme Court has authorized "sweeping" post-judgment discovery against foreign sovereigns, including in the form of subpoenas to non-party banks.  *NML Cap.*, 573 U.S. at 146; *see also EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) ("It is not uncommon to seek asset discovery from third parties, including banks, that possess information pertaining to the judgment debtor's assets."), *aff'd*, 573 U.S. 134.  The Supreme Court explained the reason for allowing broad subpoenas that seek information about a foreign sovereign's worldwide assets: the judgment creditor "*does not yet know* what property [the foreign sovereign] has and where it is, let alone whether it is executable under the relevant jurisdiction's law."  *NML Cap.*, 573 U.S. at 144.

Despite these expansive principles, Djibouti contends that the subpoenas should be quashed for two reasons.  First, it argues that the subpoenas are "patently overbroad" because they require the production of eleven years' worth of SWIFT messages that contain any of 338

keywords, subject to "two other undemanding criteria." Resp.'s Mem. at 11–13. Djibouti's characterization of the subpoenas is not entirely fair by ignoring other limitations built into the requests for records. The subpoenas are limited to SWIFT transfers of at least $25,000 USD, which is hardly an "undemanding" limitation, for example. Notably, the bank subpoena-recipients have, according to DCT, "begun responding" and "cooperat[ing] with DCT to tailor the subpoenas to maximize relevance and minimize burden." Pet.'s Mem. at 22.

In any case, the subpoenas are within the realm of what Rules 26 and 69 permit for post-judgment discovery. Djibouti's complaint that the scope of the eleven-year period of 2012 to 2023 for requested information is unreasonable because DCT filed its petition to confirm the arbitration awards in September 2020, is entirely misguided. Resp.'s Mem. at 12. The $541 million judgment corresponds to damages, legal costs, unpaid royalties, legal fees, and interest awarded to DCT after five years of arbitration as a result of the tribunal's conclusion that Djibouti breached the Concession Agreement that the parties entered in October 2006 and that was ratified by the Djibouti Parliament in December 2006. *See Doraleh I*, 2023 WL 2016934, at *1–2. Djibouti's reliance on the large list of individuals and entities about whom DCT seeks information is also unavailing because SWIFT transfers of at least $25,000 USD involving these individuals are "relevant" and "in aid of" DCT's attempts to collect the $541 million judgment against Djibouti. *See* Fed. R. Civ. P. 69(a)(2); Fed. R. Civ. P. 26(b)(1). The relevance of SWIFT transfers related to Djibouti government or state-owned institutions is self-explanatory, and information about Chinese government or state-owned institutions is relevant here, where the dispute that led to the arbitrations arose from "Djibouti awarding DCT's concession rights to Chinese state-owned companies." Pet.'s Mem. at 21. Djibouti has thus not carried its burden of

demonstrating that the subpoenas are overbroad in light of DCT's attempts to enforce a $541 million judgment against Djibouti.

Second, Djibouti argues that only DCT—and thus only DCT's provisional administrator, and not its counsel at Quinn Emanuel—had the authority to serve these subpoenas. Resp.'s Mem. 7–11. Djibouti has raised this argument before. In opposing DCT's petition to confirm the arbitration awards, for example, Djibouti argued that counsel at Quinn Emanuel did not have authority to seek confirmation of the awards without the provisional administrator's permission because 9 U.S.C. § 207 allows only a "party to the arbitration" to petition the court for confirmation. *Doraleh I*, 2023 WL 2016934, at *4 (citing Resp.'s Opp'n Pet. to Confirm at 9, 11–12, No. 20-cv-2571, ECF No. 37). Rejecting this argument, the Court explained:

> DCT is named on the record in both the London Arbitration and this suit. In both proceedings, DCT is represented by Quinn Emanuel. And as noted in DCT's briefing, the same board that authorized the arbitration authorized this ancillary proceeding seeking to enforce the Awards. Under any reasonable reading of the statute, DCT was a party to the underlying arbitration, and is therefore able to bring suit under § 207.

*Id.* at *5 (citations omitted and alterations in original accepted). Djibouti, in addition, "had the opportunity to object to [DCT's] status as a party in th[e] arbitration" and was, in fact, specifically invited by the arbitral tribunal "to comment on DCT's authority" but "declined to respond." *Id.*

As a technical matter, law of the case and preclusion may not apply. *See In re Subpoena Duces Tecum Issued to Commodity Future Trading Comm'n WD Energy Servs. Inc.*, 439 F.3d 740, 749 (D.C. Cir. 2006) ("A subpoena enforcement action is technically a different case." (citation omitted and alteration in original accepted)). Nonetheless, the reasoning in *Doraleh I*, coupled with Djibouti's acknowledgment that its pending appeal bears on this question of authority, is informative and persuasive. *See* Resp.'s Mem. Stay J. at 11 & n.5, No. 20-cv-2571,

ECF No. 50 (explaining that "each new, post-judgment legal action taken" would "raise anew the complex question of the petitioner's legal authority" and recognizing that the pending appeal would get rid of this "litigation burden").  In this post-judgment discovery dispute, as with the London arbitration and the petition to confirm the arbitration awards, DCT is represented by Quinn Emanuel.  Quinn Emanuel has authority to serve these subpoenas in an effort to enforce the judgment it won for its client.

Djibouti has made no secret that it wants to halt all proceedings by DCT to identify and recover assets to apply to the judgment pending appeal, but this is a problem of Djibouti's own creation.  As this Court has made clear, "Djibouti remains free to secure a stay in this matter by posting a bond, pursuant to Federal Rule of Civil Procedure 62(b)."  *See Doraleh II* at 6, No. 20-cv-2571, ECF No. 57.  Rather than posting bond, Djibouti now attempts to delay discovery to which DCT is entitled by moving to quash, seemingly in a disguised attempt to again stay discovery without posting bond, a "bald request" that has already been rejected.  *See id.* at 5–6.  Djibouti's motion to quash is denied.

      **B.**      **Cross-Motion for Fees**

In its cross-motion, DCT seeks the attorneys' fees and costs incurred to litigate Djibouti's motion to quash.  *See* Pet.'s Mem. at 22–24.  DCT contends it is entitled to reimbursement of such fees and costs under Federal Rule of Civil Procedure 37(a), which provides that a court must, under certain circumstances, order a party "whose conduct necessitated" a "motion for an order compelling disclosure or discovery" to "pay the movant's reasonable expenses incurred in making the motion" "[i]f the motion is granted—or if the disclosure or required discovery is provided after the action was filed."  Fed. R. Civ. P. 37(a)(5)(A).  DCT, however, fails to explain why Rule 37(a) applies *here*, where DCT has not moved to compel and thus has not incurred

expenses in "making the motion," and disclosure of the discovery at issue is entirely out of Djibouti's hands.

Alternatively, DCT requests that the Court exercise its "inherent power" to impose sanctions. Pet.'s Mem. at 22–23 n.4. To be sure, "courts have an inherent power at common law to 'protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary.'" *Parsi v. Daioleslam*, 778 F.3d 116, 176 (D.C. Cir. 2015) (quoting *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995)) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). "[I]nherent power sanctions," however, are "fundamentally penal," and thus "exercise of a court's power to impose" these sanctions requires a finding of "bad faith by clear and convincing evidence." *Id.* at 177 (citation omitted). DCT argues that Djibouti acted in bad faith because it "knew when it brought the instant motion that its arguments were frivolous." Pet.'s Mem. at 23. Specifically, DCT allegedly "advised" Djibouti that its motion to quash was untimely, that it did not have standing to bring the motion, and that the motion sought to relitigate an issue it already lost on before. *Id.* at 23 & n.4. For the reasons explained above, the clear and convincing standard required to impose inherent power sanctions has not been met here, where Djibouti filed a timely motion to quash and had standing to challenge the subpoenas as overbroad. Djibouti is nonetheless cautioned that further attempts to delay post-judgment discovery may result in sanctions in the future.

### III. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby:

**ORDERED** that respondent Republic of Djibouti's Motion to Quash Non-Party Subpoenas, ECF No. 1, is **DENIED**; and it is further

**ORDERED** that petitioner Doraleh Container Terminal SA's Cross-Motion for Sanctions, ECF No. 17, is **DENIED**; and it is further

**ORDERED** that the Clerk of Court shall close this case.

**SO ORDERED.**


Date: September 21, 2023


                                              **BERYL A. HOWELL**
                                              United States District Judge